139 So. 273

## MIDDLETON v. GENERAL WATER WORKS & ELECTRIC CORPORATION.

### 4 Div. 532.

Supreme Court of Alabama.

Oct. 29, 1931.

Rehearing Denied Nov. 27, 1931.

Further Rehearing Denied Feb. 4, 1932.

Stokely, Scrivner, Dominick & Smith, and Wood & Hawkins, all of Birmingham, and ꞮꞮ. O. Baldwin, of Andalusia, for appellant.

Rushton, Crenshaw & Rushton, of Montgomery, and A. R. Powell, of Andalusia, for appellee.

BOULDIN, J.

The case sought to be made out by plaintiff is well stated in special count 6. We set same out in full, as follows:

"Count Six: Plaintiff claims of the Defendant the sum of fifty thousand ($50,000.00) Dollars, damages for that heretofore on to-wit, the month of May, 1929, the Defendant was a Corporation engaged in the operation of electric light plants, water systems, and similar utilities, and during said month the Defendant, for valuable consideration, agreed, engaged, requested and employed the Plaintiff to negotiate for it with the holders of the capital stock of the Little Cahaba Coal Company, a corporation, which was engaged in the operation of coal mines in Bibb County, Alabama, and to purchase said capital stock for the Defendant or its nominee; at a price satisfactory to said Defendant and said nominee; and the Defendant agreed with the Plaintiff that if an offer to sell said capital stock from said stock holders was secured by the Plaintiff at said satisfactory price the Defendant would purchase said capital stock either in its own name or furnish the money for its purchase in the name of its nominee and Defendant agreed to pay Plaintiff for his services in securing such offer the sum of five per cent. of the purchase price or to cause said five cent. to be paid by the seller and added to the purchase price.

"And Plaintiff avers that in pursuance of this agreement between the Plaintiff and the Defendant, he negotiated with the said stock holders of the Little Cahaba Coal Company, and secured an agreement from all of them to sell said capital stock to Defendant or its nominee at and for the sum of to-wit, one million, $1,000,000.00, dollars, which price the Defendant agreed was satisfactory to it and to its nominee and which the Defendant agreed to pay either in its own name or for its nominee.

"Plaintiff further avers that the said price of one million, $1,000,000.00, dollars for said capital stock included a commission of five per cent. to be paid to the Plaintiff for his services in negotiating the sale and purchase, all of which facts were known to the Defendant and agreed to by it, said commission of five per cent. having been included in said purchase price to be paid by the seller under the instructions of Defendant to the Plaintiff. And Plaintiff avers that with knowledge of these facts the Defendant agreed with the Plaintiff and said stock holders to purchase said stock at said price either in its own name or that of its nominee.

"Plaintiff avers that after he had performed all of the terms and conditions of said agreement on his part between the Plaintiff and the Defendant and after he negotiated with said stock holders for the sale of said capital stock in pursuance of his contract with the Defendant and at the request of the Defendant and after he had secured an agreement on the part of all of the stock holders of said capital stock to sell the same to the Defendant or its nominee at said price of one million ($1,000,000.00) dollars, and after the Defendant had agreed to purchase said stock upon said terms and conditions, with full knowledge that said stock holders were to pay Plaintiff out of the purchase price the sum of fifty thousand ($50,000.00) dollars for the sale of said stock, which payment by said stock holders was arranged at the request of the Defendant instead of payment being made direct from the Defendant to the Plaintiff, the Defendant thereafter failed and refused to purchase said stock either in its own name or that of its nominee, and failed and refused to furnish the money for its nominee to purchase said stock, although Defendant had engaged the Plaintiff to purchase said stock for it or its nominee and had agreed so to do, and although the Plaintiff had complied with all of the terms and conditions of said contract between the Plaintiff and the Defendant on his part.

"Plaintiff avers that as a proximate consequence of the said failure and refusal on the part of the Defendant the Plaintiff lost said sum of to-wit, fifty thousand dollars, agreed to be paid by said stock holders and Defendant has refused to pay to the Plaintiff the sum of fifty thousand dollars, hence this suit."

The gravamen of the count is breach of a contractual obligation to complete the purchase of the capital stock of Little Cahaba Coal Company, pay over the $1,000,000, out of which fund plaintiff was to receive his commission of $50,000.

As long as the transaction was in negotiation, only the defendant was free to abandon the project.

The relevancy and materiality of certain rulings on testimony assigned as error turn on their tendency, in connection with the whole evidence, to establish the vital inquiry: Was there an agreement upon the price of the stock, and an agreement to take the stock at that price?

General Water Works & Electric Corporation is a Delaware corporation, incorporated in May, 1928. Its corporate powers are plenary. Besides the power to own and operate waterworks and electric plants, as indicated by the corporate name, it has the charter power to own and operate public utilities generally; and general powers broad enough to include a coal mining business.

It is in the nature of a holding company, acquiring ownership by the purchase of the stock of subsidiaries, and usually operating in their several names.

During the first year of operations, down to the date of the transactions here involved, it had acquired control and ownership by stock transfers of numerous waterworks, electric power plants, and some other public utilities located in many states. Its operations

were confined to the field of public utilities. It had not entered the field of coal mining. The main office was at Fort Worth, Tex.

Contracts had been entered into looking to the purchase of certain waterworks and electric plants in Southeast Alabama, and headquarters established at Andalusia.

Allan J. Smith, vice president, was, with the knowledge and approval of the corporate body, general manager of the corporation.

In May, 1929, the plaintiff, Mr. Middleton, interested Mr. Smith in a proposition to purchase the coal mine of Little Cahaba Coal Company, known as the Piper mine, in Bibb county, with a view to the erection of a steam electric plant on Little Cahaba river, near the mouth of the mine, to supply current for this and neighboring mines, and probably connecting up with the Southeast Alabama plants.

Mr. Smith sent to Birmingham, David Stewart, an engineer, with a letter to Mr. Middleton, showing Stewart was empowered to make a full investigation of all phases of the proposition, and report thereon.

Investigation and negotiations with the management of the coal company, participated in by Mr. Smith, Mr. Stewart, and Mr. Middleton, proceeded concurrently for some weeks, during which time an option on the stock was taken, in the name of Mr. Middleton, and a written agreement with the stockholders of the coal company to pay Mr. Middleton 5 per cent. commissions, if, as, and when the money was paid over to them for their stock. Evidence for plaintiff goes to the effect that this was all in collaboration with Stewart, and later made known to and approved by Mr. Smith.

General Water Works & Electric Corporation declined this proposal to purchase the stock in the coal company. An answer to interrogatories propounded by plaintiff to defendant, and introduced in evidence by plaintiff, discloses that it was disapproved by Mr. Cain, acting director of the company in New York in the matter of the acquisition of new properties. Mr. Middleton was advised that the company would not go into the coal mining business. He disclaims knowledge that it was turned down by Mr. Cain.

Thereupon Mr. Middleton evolved the plan of enlisting Mr. Darius A. Thomas, a mine owner and practical mine operator, to take over the mining proposition, the defendant corporation furnishing the money to buy the coal mine through the purchase of stock.

Omitting details, it will suffice to say plaintiff's evidence tends to show negotiations on the new project proceeded among all parties to the point of an agreement, whereby Mr. Thomas and Mr. Walter Henley, president of the coal company, should agree upon the price to be paid for the stock; whereupon Mr. Smith, speaking for his company, agreed the deal should be closed; and plaintiff testifies he was notified by Mr. Henley and by Mr. Thomas that the price of $1,000,000 had been agreed upon. The defendant did not close the deal.

There was sharp conflict in the evidence upon various phases of the case going to the issue whether Mr. Smith undertook, on behalf of his company, to complete the purchase upon an agreement by Mr. Henley and Mr. Thomas as to the price to be paid for the stock. Several rulings rejecting evidence which plaintiff claims to have been material on this inquiry are stressed in argument.

Appellee insists the defendant was due the affirmative charge for want of evidence of authority in Mr. Smith to bind his company, and the rejection of evidence not relevant to this essential issue was harmless. The inquiry thus raised is this: Does the office of general manager carry the implied power to conclude such a transaction without the approval of the governing body, or some other officer authorized to approve same?

This court has, in several cases, had occasion to consider the powers of a general manager of a corporation, or officer exercising like powers.

As the title implies, it carries the power to manage the business in which the corporation is engaged; he is the alter ego of his company in all matters incident to the carrying on of its ordinary business. This rule is for the protection of the public, as well as to enable the corporate body to function; and secret restrictions on the power of one held out as general manager are not effective as against one who deals with him on the faith of his position, without knowledge of such restrictions. Navco Hardwood Co. v. Bass, 214 Ala. 553, 108 So. 452; Modern Order of Praetorians v. Childs, 214 Ala. 403, 108 So. 23; Sheip v. Baer, 210 Ala. 231, 97 So. 698; Dadeville Union Warehouse v. Jefferson Fertilizer Co., 194 Ala. 683, 69 So. 918; Alston v. Broadus Cotton Mill, 152 Ala. 552, 44 So. 654; Baird Lumber Co. v. Devlin, 124 Ala. 245, 27 So. 425; First Nat. Bank of B'ham v. First Nat. Bank of Newport, 116 Ala. 520, 22 So. 976; Bibb v. Hall, 101 Ala. 79, 14 So. 98.

The employment of a general manager, however, does not mean it becomes a one-man corporation, nor imply an abrogation of the usual powers of the board of directors. The powers of the general manager are limited to the scope and character of the business committed to his management. In ordinary cases, it may be said the scope of such business is generally known and understood by those who have transactions in that line of business. They are chargeable with such knowledge.

Scores of cases have arisen involving the power of the general manager, wherein the

decision has turned on whether the transaction was incident to and within the scope of the business whose management was committed to him.

For the purposes of this case, it is sufficient to say the office of general manager does not carry power to control and augment the scope of the business by entering into entirely new fields not indicated by the corporate name. General policies of that character are presumed to be retained by the board of directors. Dixie Industrial Co. v. Atlas Lumber Co., 202 Ala. 562, 81 So. 64; Sweetser v. Shorter, 123 Ala. 518, 26 So. 298; Baird Lumber Co. v. Devlin, supra; 1 Meecham on Agency, §§ 740, 980, 1006; 3 Thompson on Corporations, §§ 1692, 1698; 4 Cook on Corporations (8th Ed.) § 719, p. 3036 et seq.

It may be regarded as part of the business of a holding company of this character to acquire ownership of corporate units through the purchase of stock. This would imply an authority in the general manager to make investigation of all matters essential to an understanding of the merits of a proposal, and to enter upon such preliminary negotiations as required to formulate a definite proposition he is willing to recommend to his company.

His implied power to conclude the purchase of a new unit, at the cost of a million dollars, even if of the class the company is buying, without submitting same to the repository of supreme corporate power, is not involved in this cause.

Be that as it may, we are clearly of opinion he has no implied power to bind his company to pay a million dollars for the purchase of an enterprise of a different character from those in which it is then engaged. The power to so purchase for or in the name of another would be the less implied. By this, we are not saying the general manager, Smith, did so undertake to conclude his company. On the other hand, aside from his express denial, much evidence offered by plaintiff indicates that his assurances were that the company had the resources to make a purchase, and would probably take it at a satisfactory price, meaning a satisfactory price after all phases of the project, all elements of value, were known. Admittedly, plaintiff was advised the corporation had turned down the proposal for a direct purchase of the stock; a proposal, according to plaintiff's version, favorably considered by Mr. Smith.

■ The rejected evidence, viz. telegrams passing between Mr. Smith and Stewart, and pay rolls showing payment of expense and salary items, can furnish no aid on this issue. They do not tend to show any acquiescence of the company or even knowledge of any effort of Mr. Smith to finally bind and conclude his company without submitting same with his recommendation.

■ Neither can it be presumed that any report made by Stewart to Smith would furnish evidence of such knowledge and acquiescence. There was no effort to show any such report ever reached the corporate body, or any one empowered to acquiesce in such committal. There was an offer to bring such report into court to be examined by the trial court. It does not appear in the record so as to bring the ruling of the trial court on its admissibility under review.

We would make it clear we are not dealing with the authority of Mr. Smith to employ Mr. Middleton as a real estate broker in connection with these negotiations. The issue presented and tried involves a contract by which plaintiff was due a commission only when the contract was closed and the money paid over to the sellers, who, in turn, were to then pay the commissions. A binding contract with the sellers, and a breach of such contract, are necessary to a recovery. Such case, we conclude, was not made out for reasons above indicated.

■ We are further impressed no reversal of the judgment below should be had for another reason.

The project contemplated as a leading inducement to the purchase the building of a steam plant on the Little Cahaba river for the generation of electric energy. The building of a dam on the river was shown to be regarded as one of the essentials. The coal company did not own this power site. The testimony of Mr. Henley relied upon by plaintiff to show a satisfactory price was agreed upon between him and Mr. Thomas discloses that Mr. Thomas advised him that Mr. Stewart and Mr. Smith considered some 120 acres of land essential to the plant; that it was thought best to acquire this in fee simple, and Mr. Henley endeavored to do so without success. Mr. Henley further shows it was decided certain mining leases should be extended. This had not been done when the matter was dropped by defendant.

While Mr. Henley holds the view that he and Mr. Thomas reached an agreement upon $1,000,000 as the value of the stock, this price contemplated augmented values in extended leases and a dam site, or, at least, the matter was in negotiation merely pending these matters. Mr. Henley concludes his testimony thus: "I would like to state this—I construed all of the negotiations as the customary negotiations between prospective buyers and prospective sellers, negotiations that go on between buyers and sellers in arriving at figures and things of that kind."

Mr. Thomas is quite positive no final agreement was reached. There is testimony from plaintiff and other witnesses that Mr. Henley and Mr. Thomas announced that an agreement had been reached. This can hardly be regarded as contradicting the testimony of

Mr. Henley as to the incidents or bases of such agreement, or that the agreed price was tentative, a part of pending and unconcluded negotiations.

We conclude no reversible error is presented.

Affirmed.

ANDERSON, C. J., and GARDNER and FOSTER, JJ., concur.